# IDA PHILLIPS, Appellant, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY.

**Division One, April 13, 1908.**

1. **RAILROAD HOSPITAL: Public Charity: Liability.** A hospital association, organized by a railroad company, having for its incorporators and officers chief officers of the railroad, who make its rules and regulations, having for its object to provide medical and surgical treatment and care for the employees of the railroad exclusively, and maintained by a monthly deduction from the wages of said employees without their consent thereto, and requiring notice to the railroad company's chief surgeon and claim agent whenever an employee is removed to its hospital, and making the chief surgeon and the other surgeons of the association the chief surgeon and division surgeons of the railroad company, is not a public charity or a charitable institution.

2. ————: **Alter Ego of Railroad.** Such an association, though having a separate corporate charter, is the railroad company itself, its *alter ego*. At least it is its agent, and the negligence of the agent is the negligence of the railroad company.

3. ————: ————: **Negligence: Evidence: Letter from Chief Surgeon.** Plaintiff's husband had been an employee in defendant railroad's auditor's department, and from his monthly wages defendant had taken out a small fee which entitled him to be received at a hospital maintained by defendant for the care and treatment of its employees. The hospital was owned and managed by a separate corporation, which was defendant's *alter ego*, at least its agent. He lived in St. Louis, and on a round-trip ticket went to the hospital at Springfield, and was treated for a time, and then on the return part of the ticket returned to St. Louis, arriving there about seven o'clock in the evening, and left the train unattended, and about nine o'clock a man partly dressed in a condition to retire for the night, was lying across one of the street car tracks and was run over and killed by a passing car, and it was afterwards shown that the man was plaintiff's husband. One of the rules of the defendant company, promulgated for the government of the hospital, forbade treatment for insane employees, and another required the chief surgeon of the hospital, who was also the defendant's chief surgeon, to notify the auditor's department that plaintiff's husband could no longer be kept. *Held*, that a letter written by the chief surgeon to the assistant

auditor two days after the death of deceased, but at a time when neither knew he had been killed, in which it was stated that deceased "was in the asylum and is mentally unbalanced," was erroneously excluded from evidence.    Being an admission made by defendant's agent pertaining to things occurring and being done by the agent in the course of the performance of his duties, it was an admission of defendant that it had knowledge that plaintiff's husband was mentally unbalanced.

4. ——: ——: ——: ——: ——: Res Gestae.    Said letter was in the nature of a report made by one official to another, contemplated by defendant's rules, and is not in the same line as a statement made, after an accident, but too late to be recognized as a part of the *res gestae*.

5. ——: Negligence: Placing Insane Patient On Train: Proximate Cause.    Where defendant's chief surgeon had knowledge that plaintiff's husband, who had been treated in its hospital, of which he had charge, was insane, and permitted him to be placed on a train, unattended and without notice to his family, knowing that he would have to find his home in St. Louis to which he was going, it was for the jury to say, under properly guarded instructions, whether or not the chief surgeon, and therefore defendant, might have reasonably expected that when the man reached St. Louis he would place his practically undressed body across a street railway track and be killed by an oncoming car.    If the injuries are the natural, though not the necessary and inevitable result, of the negligent fault—such injuries as are likely, in ordinary circumstances, to ensue from the omitted care—the defendant is liable.    The jury must find that the deceased was insane, that defendant knew that fact, and that his placing of his practically undressed body across the street railway track in front of the car was occasioned by reason of his insane condition.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale*, Judge.

REVERSED AND REMANDED.

*Joseph A. Wright* for appellant.

(1) Neither negligence nor contributory negligence can be imputed to an insane person. Williams v. Hays, 157 N. Y. 541; 143 N. Y. 442, 2 App. Div.

(N. Y.) 183; Jackson v. Railroad, 157 Mo. 621; Washington v. Railroad, 17 W. Va. 190; Railroad v. Gregory, 58 Ill. 226; Wharton on Negligence (2 Ed.), secs. 87, 88; Campbell v. Railroad, 175 Mo. 161; Anderson v. Railroad, 161 Mo. 411; Stern v. Bensieck, 161 Mo. 146. (2) The evidence did not justify the court in declaring as a matter of law that the deceased committed suicide. Laessig v. Travelers' Protective Association, 169 Mo. 272; Royal Arcanum v. Brashears, 89 Md. 624; Stotler v. Railroad, 200 Mo. 107, 146; Home Benefit Association v. Sargent, 142 U. S. 691; Ins. Co. v. Wiswell, 56 Kan. 765; Ins. Co. v. Pogue, 105 Fed. 172. (3) Suicide, if the deceased was insane, is no defense in an action charging breach of duty to an insane person. Wells v. Railroad, 49 N. Y. Supp. 510; Railroad v. Parry, 67 Kan. 515; Worthington v. Mencer, 96 Ala. 310; Thompson on Negligence, par. 338; Simpson v. Rhode Island Co., 26 R. I. 200. (4) The injury in the precise form in which it in fact occurred need not have been foreseen; it is sufficient if it now appears to have been a natural and probable consequence. Hoepper v. Southern Hotel Co., 142 Mo. 378; Harrison v. Kansas City Electric Light Co., 195 Mo. 606; Graney v. Railroad, 140 Mo. 89; Miller v. Railroad, 90 Mo. 389; City of Dixon v. Scott, 181 Ill. 116; Hill v. Windsor, 118 Mass. 251; 1 Thompson on Negligence, par. 59. (5) Defendant was negligent as a common carrier of passengers for hire, in not extending to the deceased that degree of care and protection demanded on account of his known and apparent insane condition. Railroad v. Parry, 67 Kan. 515; Wells v. Railroad, 49 N. Y. Supp. 510; Eidson v. Railroad, 23 So. 369; Foss v. Railroad, 66 N. H. 256; Croom v. Railroad, 52 Minn. 296; Railroad v. Gilmer, 18 Tex. Civ. App. 680; Hutchinson on Carriers (3 Ed.), 992; 3 Thompson on Negligence, par. 2934. (6) Defendant failed and omitted to give deceased the care and protection con-

tracted for. Ward v. St. Vincent's Hospital, 57 N. Y. Supp. 784; Hewett v. Woman's Hospital, 73 N. H. 556; Texas & Pacific Coal Co. v. Connaughton, 20 Tex. Civ. App. 642; Brown v. LaSocieté Francaise, 138 Cal. 475; Glavin v. Rhode Island Hospital, 12 R. I. 411. (7) The hospital association is the general agent of defendant in caring for its sick employees, supported by their contributions, and has none of the essential elements of a charity. Haggerty v. Railroad, 100 Mo. App. 424; Coe v. Washington Mills, 149 Mass. 543; Brown v. LaSociete Francaise, 138 Cal. 475; Miller v. Railroad, 65 Fed. 305; Texas & Pacific Coal Co. v. Connaughton, 20 Tex. Civ. App. 642. (8) The use made by defendant of the hospital association is not within the provisions of article 2, chapter 12, Revised Statutes 1899, and defendant is liable in the same manner as if operating through a relief department of the company's regular business. Hiatt v. Fraternal Union, 99 Mo. App. 105; In re St. Louis Institute, 27 Mo. App. 633; Franta v. Bohemian Union, 164 Mo. 304; Re Globe Mutual Benefit Association, 135 N. Y. 280, 17 L. R. A. 547; State v. Ohio Central Relief Assn., 29 Ohio St. 399; Bacon on Benefit Societies and Life Insurance (3 Ed.), par. 62; Angell and Ames on Corporations, par. 126. (9) The letter from George W. Cale, Jr., chief surgeon, to W. P. Newton, is admissible in evidence. McDermott v. Railroad, 87 Mo. 287; State ex inf. v. Packing Co., 173 Mo. 356; Mekell v. Ins. Co., 144 Mo. 420; Malecek v. Railroad, 57 Mo. 17; Hill Bros. v. Bank of Seneca, 100 Mo. App. 250; Sisk v. Ins. Co., 95 Mo. App. 710; Kirkstall v. Railroad, L. R. 9 Q. B. 468; McGenness v. Adriatic Mills, 116 Mass. 177; Hall v. Ins. Co., 23 Wash. 610; Railroad v. Closser, 126 Ind. 348; Ins. Co. v. Monarch, 99 Ky. 578; Trust Co. v. Ins. Co., 71 Fed. 81; 2 Wharton on Evidence, par. 1177.

*W. F. Evans* and *J. G. Egan* for respondent.

(1)   Defendant is not liable for negligence, if any, of the physicians of the hospital association. Railroad v. Artist, 9 C. C. A. 14, 60 Fed. 365; Pierce v. Railroad, 66 Fed. 44; 15 Am. and Eng. Ency. Law (2 Ed.), 763. (2)   One who employs a physician to attend another is bound only to exercise ordinary care in selecting the physician, and where such care is used, is not liable for the negligence of the physician. Railroad v. Artist, 9 C. C. A. 14, 60 Fed. 365; Pierce v. Railroad (C. C. A.), 66 Fed. 44; Quinn v. Railroad, 94 Tenn. 713, 28 L. R. A. 552; Haggerty v. Railroad, 100 Mo. App. 451; Railroad v. Sullivan, 141 Ind. 83; Railroad v. Zeiler, 54 Kan. 340; Richardson v. Coal Co., 10 Wash. 648; Railroad v. Price, 32 Fla. 46; Eighmy v. Railroad, 93 Iowa 538; Railroad v. Hanway, 57 S. W. 695; Secord v. Railroad, 18 Fed. 221; 3 Elliott on Railroads, sec. 1388; Iron Co. v. Ketron, 102 Va. 23; Pearl v. Railroad, 176 Mass. 177.   (3)   An insane person is liable for his torts. McIntyre v. Sholty, 121 Ill. 600; Krom v. Schoonmaker, 3 Barb. 647; Cross v. Kent, 32 Md. 581; Jewell v. Colby, 66 N. H. 399; Morse v. Crawford, 17 Vt. 499; Ward v. Conatser, 63 Tenn. 64; Morain v. Devlin, 132 Mass. 87; 1 Cooley on Torts (3 Ed.), pp. 171-177; Buswell on Insanity, sec. 355; note 26 L. R. A. 153.   (4)   Upon the theory on which the plaintiff charges the defendant was negligent, the plaintiff was contributorily negligent, and has no right to recover.   Wiese v. Remme, 140 Mo. 289; Bamberger v. Railroad, 95 Tenn. 18; City of Pekin v. McMahon, 159 Ill. 141; Smith v. Railroad, 92 Pa. St. 450.   (5)   The duty of the defendant was performed when it discharged James B. Phillips safely at his destination. Hendrick v. Railroad, 136 Mo. 548.   (6)   The burden is upon the plaintiff to prove that some negligence of the defendant was the proximate cause of the death of Phillips. Harper v. Term. Co., 187 Mo. 586; War-

ner v. Railroad, 178 Mo. 134. (7) The facts as to the death were clear and undisputed, and the question of proximate cause was for the court to determine. Henry v. Railroad, 76 Mo. 288. (8) The liability of a party for his negligence is limited to injuries which he could have foreseen as a probable consequence, and which are the direct consequence of his negligence. Haley v. Railroad, 179 Mo. 30; Henry v. Railroad, 76 Mo. 288; Saxton v. Railroad, 98 Mo. App. 501; Scheffer v. Railroad, 105 U. S. 249; Daniels v. Railroad, 183 Mass. 393; Korn v. Railroad, 125 Fed. 897; Nash v. Railroad, 136 Ala. 177; Gaukler v. Railroad, 130 Mich. 666; Brown's Admr. v. Railroad, 19 Ky. Law R. 1873; Railroad v. Valleley, 32 Ohio St. 345; Hamilton v. Railroad, 183 Pa. St. 638; Hullinger v. Worrell, 83 Ill. 220; Adkins v. Ins. Co., 70 Mo. 27; Streeter v. Accident Society, 65 Mich. 204. (9) Defendant is not liable for the suicide of Phillips. Scheffer v. Railroad, 105 U. S. 249; Daniels v. Railroad, 183 Mass. 393. (10) The letter from Dr. Cale to Mr. Newton was not authorized by the defendant, was not a part of the res gestae in any transaction by Dr. Cale for the defendant, and was not admissible. Koenig v. Union Depot Co., 173 Mo. 721; Redmon v. Railroad, 185 Mo. 11; Devlin v. Railroad, 87 Mo. 549; Aldridge's Adm. v. Furnace Co., 78 Mo. 559; Rogers v. McCune, 19 Mo. 569.

GRAVES, J.—This is an action by the widow to recover the sum of $5,000, for the alleged negligent killing of her husband, James B. Phillips, who died April 11, 1904. The trial court having given a peremptory instruction to find for the defendant, the plaintiff took an involuntary nonsuit, with leave, and after unsuccessful motion to set aside the nonsuit so taken, perfected her appeal to this court.

Phillips, the deceased, was an employee of defendant in its Auditor's department. As such employee

there had been taken out of his wages a small monthly hospital fee, which entitled him to be admitted and treated in a certain hospital system alleged upon the one hand to be maintained by the defendant for that purpose, and upon the other hand to be a separate and distinct corporation from the defendant, and maintained by certain employees of defendant, and not by the defendant itself. Shortly prior to his death Phillips had been furnished a pass by the defendant over its line from St. Louis to Springfield and return, and using such employee's pass he went from St. Louis to Springfield to take treatment for his ailments in the hospital there, which was a part of the hospital system above mentioned. For a time he was treated and on a certain morning took passage upon one of defendant's trains at Springfield bound for St. Louis, his home. This train arrived about seven o'clock that evening and deceased left the train unharmed. About nine o'clock of the same evening a man, partially undressed and in condition to retire for the night, was lying across one of the many street car lines of the city and was run over and killed by a passing car. Some two weeks later the body was exhumed and identified as that of James B. Phillips. Plaintiff had no knowledge of the peculiar and untimely death until about the latter date. The claim is that Phillips was mentally unbalanced, which fact was known to defendant, and that defendant was remiss in duty in not notifying his family of his departure from the Springfield hospital before his arrival in St. Louis, and further in turning loose upon the streets of said city, unattended, a man in that known mental and helpless condition.

There are several peculiarly interesting questions, which, together with the incident facts, will be duly noted.

I. Plaintiff having been cast upon her proof rather than upon the pleadings, the legal questions involved must be entwined with all pertinent facts shown. In such case the facts proven by her are established facts for the purposes of this review. At the threshold of the inquiry is the relationship between defendant and "The Employees' Hospital Association of the Frisco Line," a corporation, separately incorporated by the leading officials of defendant. The hospital at which plaintiff's husband was treated, was part and parcel of the hospital system managed by the association above named. Defendant contends that it is in no sense responsible for the negligent acts, if such there were, of "The Employees' Hospital Association of the Frisco Line;" that it is a distinct corporate entity, not under control of defendant, and that it is responsible for its own acts of negligence. This relationship between the defendant and the Hospital Association is important on the question of excluding certain evidence, in additon to the point now in review. The charter of this association was in evidence. By article one thereof the corporation is named. Articles two, three and four read thus:

"Article II. The purpose for which this association is formed is the support of a benevolent and charitable undertaking in this: To provide medical and surgical treatment and care for the employees of the St. Louis & San Francisco Railroad Company, and of its associated companies, who may be injured or disabled by accident or sickness while in such employ, and in the line of duty, to such extent only and under such rules and regulations as may be prescribed from time to time by the trustees hereinafter provided for; and to furnish such employees with additional privileges and benefits, not inconsistent or interfering with the main object of the association as may from time to time be directed by the said trustees; and to that end

may purchase, acquire, erect and maintain, suitable buildings, with necessary land and appurtenances for hospital and other purposes within the purview of these articles; and to sell, convey, encumber and transfer any such property whenever said trustees shall direct.

Article III. All the powers of the association and of any corporation into which it may be merged, shall be vested in and exercised by five trustees, who shall manage and conduct the business and control all its property; the names and residences of those who shall be trustees until their successors shall be chosen as hereinafter provided, are as follows:

B. F. Yoakum, of St. Louis, State of Missouri.

L. F. Parker, of St. Louis, State of Missouri.

A. J. Davidson, of St. Louis, State of Missouri.

C. C. Mills, of Monett, State of Missouri.

Chas. Huffschmitt, of St. Louis, State of Missouri.

"Their successors shall be chosen at such time and in such manner as may be provided by the by-laws, which the trustees shall adopt for the government of the affairs of the association, and which they shall make for the government of the affairs of the association and which they may amend as shall seem best to them.

"Article IV. The association shall not engage in business for pecuniary profit in any form, and shall not have any capital stock; the funds necessary for carrying out its purpose shall be raised in such manner as may be provided by the by-laws."

Article five provides the place of business for the corporation and article six provides the term of fifty years as the life of the corporation. By the rules adopted and promulgated by B. F. Yoakum, president of the board of trustees, it is provided, among other things, as follows:

"*Rules and Regulations.* It being contemplated

that, for the consideration of the contribution paid monthly by the members of the Employees' Hospital Association of the Frisco Line, a home and medical attention for the sick and injured of said association will be provided, in accordance with the following rules and regulations, it is directed:

"1. Medical relief will only be furnished at the hospital of the association, except as hereinafter designated.

"2. Only those who have become sick or injured while in the employ of the St. Louis and San Francisco Railroad System, and in the line of their duty, will be entitled to gratuitous treatment. Those suffering from any complaint which existed, or the cause of which existed, before the party last entered the employ of the railroad company, will not be entitled to treatment.

"3. Employees of the railroad system taken sick or injured while at any point on the line of the St. Louis & San Francisco Railroad, on temporary lay-off, are entitled to treatment; provided, said sickness was contracted while in course of his employment prior to such lay-off, and provided further, that they have become liable for dues for the month during which their sickness originated or injury occurred. . . .

"5. Any member who may be too seriously ill or injured to be removed with safety to his life, may receive temporary aid along the line of the railroad, when authorized by the chief surgeon. . . .

"11. Any member of the association who desires medical treatment must take to his physician a written or printed notice from his employer that he is entitled to such treatment, and no employer will be allowed to furnish such notice unless he is fully satisfied that the patient is entitled to same. All such printed or written notices are good only for the months in which they are issued, or for a single spell of sickness. . . .

"16. When a patient is too seriously ill or injured to be promptly sent to the association hospital the attending physician or surgeon shall at once wire a full report to the chief surgeon and must act under instructions of rule No. 5 until further advised. However, at the earliest possible moment consistent with the patient's safety, he must be sent to the hospital."

Upon the organization of the hospital association or shortly thereafter, the defendant in this case sent out rules to employees as follows:

' "The Employees² Hospital Association of the 'Frisco Line,' having agreed to furnish necessary medical, surgical and hospital treatment to such employees of the St. Louis & San Francisco Railroad System as may become sick or injured while in the service of said companies, and to erect and maintain a hospital for the use of such sick and injured, and the employees of said system having agreed to contribute to a fund to be paid to said Hospital Association, to be used and expended by the association for such purpose, the following rules for the guidance of employees are hereby promulgated:

"1. Mail carriers at stations where carrying the mail is the only duty performed by them for the company, are exempt from assessment, and are not entitled to the services and benefits of the Hospital Association.

"2. The sick and injured employees above mentioned are entitled to hospital care and treatment free of charge so long as they require surgical or medical attention and obey the rules established for their protection, but not for a term longer than one year continuously unless by permission of the board of trustees of said Hospital Association.

"3. Heads of departments and foremen will be furnished with blank certificates, and will issue them properly signed to such employees as are entitled to

the benefit of the Hospital Association and every employee receiving such certificate will be entitled to receive from the head of his department free transportation over the companies' lines to the hospital, which, in case of emergency, when delay may be dangerous, will be provided by telegraph on application to the proper officer. These certificates are good only in the month for which they are issued.

"4. The company hereby donates to the Hospital Association the use of its telegraph lines to facilitate the care and treatment of sick-or injured employees, and therefore all persons in the service of said companies, and all others are hereby notified that no bills for medical or surgical services, nursing, drugs or funeral expenses, will be paid by these companies unless first authorized by the general claim agent.

"5. In every case of personal injury to an employee, the conductor or foreman of the department in which the party is employed must report particulars as soon as possible by wire to division superintendent or head of department in which the accident occurs. State whether a surgeon has been summoned to attend, and if so, give such surgeon's name, and state further whether the injured man will be transported to General Hospital. It will be the duty of the above officers to see that such telegraphic advice is promptly given them, and they will at once telegraph full particulars to superintendent, chief surgeon, and general claim agent.

"6. If such injured employee can be moved, send him to General Hospital by first train and notify chief surgeon and general claim agent. If the injured employee cannot be moved, place him in care of the nearest local agent and summons the most available local surgeon to attend him. If possible, he should be taken to the nearest emergency hospital, to be transported to General Hospital when able. In case of absolute

necessity when life or limb is involved, secure the nearest competent surgeon to give attention to the injured person until the local surgeon can reach the spot, or the injured person can be transported to General Hospital or to one of the emergency hospitals. Be particular to notify such surgeon that his services are required for first attention only, and that any differences in the amount to be paid him by the Hospital Association for such service shall be decided by the chief surgeon or the Hospital Association as final arbiter. Notify the chief surgeon by wire at once of such employment, and also as to whether amputation or surgical operations are immediately necessary.

"7. Stretchers for use of injured men will be placed at each station where division of local surgeons are located, and in cabooses and train baggage cars.

"8. The conductor in charge of train having patients for General Hospital will at once report that fact by wire to chief surgeon and to general claim agent, and state whether ambulance is required. In case such patients are for emergency hospitals, the division surgeon at the point where the emergency hospital is located must be similarly notified by wire.

"9. In cases of wrecks or accidents when a number of persons, either passengers or employees, are injured and require immediate attention, summon at once the nearest competent surgeon, summon at the same time the nearest division or local surgeon who can reach the scene of the accident most quickly, and in addition to the notice to be given division surgeon, superintendent, or head of department, notify by wire, promptly, the chief surgeon, superintendent, and general claim agent, giving full particulars as to the name and whereabouts of the injured persons, name of surgeons in attendance, and state what further attention is required for the relief of the injured. . . .

"13. The persons who have been, or may hereafter be, appointed by the Hospital Association chief

surgeons, assistants, hospital dispensary, division and local surgeons and physicians, are hereby appointed chief surgeon, assistants, division and local surgeons and physicians, as the case may be, of the St. Louis and San Francisco Railroad Company, and its leased and operated lines (while they hold such positions in connection with said Hospital Association), for the care and treatment under the rules above established of all passengers, citizens and non-employees who may be injured on the line of this company, and as such will be respected and assisted in the discharge of their professional duties when called upon.

"B. F. YOAKUM,
"Vice-President and General Manager."

The defendant likewise sent out an official circular of date June 29, 1899, as follows:

"A large majority of the employees of this company have requested the establishment of a railway hospital system on the line of the St. Louis & San Francisco Road, similar to the system in vogue and successfully carried on by many railroad companies and their employees, with which the employees of this company are generally familiar, and have agreed to contribute to a fund for the proper care of such of their number as may become sick or be injured while in the service of the company.

"The benefits and advantages secured under this system by employees who unfortunately become disabled through illness or injury from following their usual avocation and thereby sustain consequent loss, have been conclusively demonstrated. The further fact that the employees secure hospital benefits, including medical and surgical attention, at a much less cost yearly than by any other assessment or insurance plan for that object, will commend to all concerned the establishment of the system on this company's lines.

"In pursuance to above, the Employees' Hospital Association of the Frisco Line has been duly organized and incorporated, and a suitable building for the general hospital, for the treatment of sick and injured employees, erected at Springfield, Missouri, which is owned by the association, and will be in charge of its chief surgeon. This building will be ready for occupancy August 1, 1899. Arrangements will be made with hospitals at St. Louis, Missouri, Ft. Smith, Arkansas, Paris, Texas, Joplin, Missouri, Pittsburg, Kansas and Wichita, Kansas, for treatment in cases of emergency, until the patient can be safely removed to Springfield. Supply stations for dispensing purposes will be established at such convenient points on the line as shall be found necessary.

"Patients received at the hospital will be provided, free of charge, with everything necessary for their careful and comfortable treatment, including the services of the hospital surgeons or physicians, so long as they require surgical or medical attention and obey the rules established for their protection, but not longer than one year, without special authority from the trustees.

"For the purpose of carrying into effect the above system, and to enable all the employees to become members of and entitled to all the benefits and privileges of said association, notice is hereby given to all concerned that, commencing with the wages for month of July, 1899, which are payable in August, an assessment will be made on the pay rolls (including salary vouchers), as follows:

"Thirty-five cents per month from the pay of each employee whose monthly wages amount to less than $50 per month; fifty cents per month from the pay of each employee whose monthly wages amount to $50 and less than $100; seventy-five cents per month

from the pay of each employee whose monthly wages amount to $100 and less than $125; one dollar per month from the pay of each employee whose monthly wages amount to $125 and more. Deductions to apply to time checks as well as pay rolls. No deduction will be made from the earnings of an employee whose month's earnings do not amount to five dollars. No deduction will be made from the wages of any employee who is discharged or quits the service of this company on or before the 31st day of July, 1899. After that date no exception will be made.

"Heads of departments, foremen and all others who issue time checks, will see that the proper deduction is made on the first time check issued in the month, designated 'Hospital.' In case an employee returns to service in the same month and after having drawn pay by time checks, and receives another time check in the same month, the person issuing the time check will note on the second check, 'Hospital fees paid on previous check.'

"This company will pay to said hospital fund as an assessment the sum of five hundred dollars annually, in monthly installments.

"All employees of the St. Louis & San Francisco Railroad System are entitled to hospital benefits under such rules and regulations as may be established for the government of the hospital.

"Rules and regulations governing the disposition and treatment of ill and injured employees will be issued and all employees should become familiar with those regulations, as they are established for the benefit of all.

"The surgeons and physicians of the St. Louis and San Francisco Railroad Company, will, on and after August 1, 1899, be under the control and direction of the chief surgeon of the Hospital Association and all ill or injured employees will, on and after that date,

be under the care and treatment of the Hospital Association.                     B. F. YOAKUM,
"Vice-President and General Manager."

From this circular it appears that no option is left an employee, but, on the other hand, defendant appropriates a certain amount of his wages and furnishes him medical treatment. From oral evidence it appears that the officers of this Hospital Association were officers of the defendant; the treasurer was the same; the employees made no formal application for admission as members, but only signed pay-rolls with the deductions made as provided for in the foregoing documents.

We have set out this evidence perhaps in more detail than should have been done, but the relationship between these two corporations is an important one, and not confined to this case alone. To our mind it is immaterial as to the true character of the Hospital Association as indicated by its charter provisions. It has, however, but few, if any, of the ear-marks of a voluntary benevolent association. Nor are there any ear-marks of a public charity. What is received is paid for by the recipients. Under the weight of authority it cannot be held to be a charitable institution. [Haggerty v. Railroad, 100 Mo. App. 424; Coe v. Washington Mills, 149 Mass. 543; Brown v. La Societe Francaise, 138 Cal. 475; Miller v. Railroad, 65 Fed. 305; Texas & Pac. Coal Co. v. Connaughten, 20 Tex. Civ. App. 642.]

So that the rule that exempts such institutions from liability as announced in Murtaugh v. St. Louis, 44 Mo. 480, does not apply. Nor are institutions of the character of the one disclosed by this record exempted from liability by the mere employment of competent servants. They must go further and competently treat the patients received. In such case they occupy

the position of ordinary physicians and surgeons and are bound by the same rules, which are too familiar for repetition here. If they undertake to furnish the treatment, not as a charity, they stand in no different light from the ordinary physician.

But this question is really beside the issues in this case. No one can read this record without concluding that if the thin corporate shell of the Hospital Association is broken, the yelk therein contained is the defendant. By rule one above quoted defendant exempts certain mail carriers from assessment and excludes them from benefits. By rule three, the heads of the departments and the foremen of the defendant are furnished with blank certificates which they fill and issue to employees entitled to receive benefits, and such heads of departments and foremen, the *alter ego* of defendant, thus decide who shall be treated by the Hospital Association. By rule five, the defendant's chief surgeon and general claim agent must be notified, and by rule six if the employee injured can be moved to the hospital, the chief surgeon and general claim agent must be notified. Why notify the general claim agent of defendant if the two corporations were separate and distinct entities, in fact? That the Hospital Association is operated for the benefit of defendant as much or more than for the benefit of the employees is too apparent from this record. Rule eight, above, breathes the same thought, as also do rules nine and ten. But beyond all is rule thirteen, which makes the chief surgeon and other surgeons of the Hospital Association, the chief surgeon and the local and division surgeons of the defendant. Eliminating all other matters this rule thirteen makes the chief surgeon and other surgeons the agent and employees of the defendant. But further showing that the hospital association, or its several surgeons, is but the *alter ego* of defendant, we have Circular No. 35, supra, by which

defendant says to all employees that they will be assessed to pay for this medical attention. No option is given an employee. By force of this rule, defendant says to an employee, We will take so much of your monthly earnings and in the event you are hurt or become sick, and in the judgment of the heads of the departments and the foremen in our employ you are entitled to medical treatment, we will furnish it to you through the Hospital Association.

So that it becomes unnecessary in this case to break the extremely thin and attenuated corporate shell of the Hospital Association, and expose to open view the yelk therein contained. The Hospital Association, whether it in fact be a separate corporate entity, or in fact the defendant itself masquerading under an assumed name, is at least the agent and employee of the defendant to perform these particular services. The defendant pays its said agent $500 annually and in addition it requires of its employees that they pay to it the remainder, and by it such sum is paid to the agent for these services. To say the least, this Hospital Association together with all its surgeons and physicians are but agents of defendant, and made so by express words in rule thirteen, supra. The negligence of these agents is the negligence of the defendant. As said in the case of Orcutt v. Century Bldg. Co., 201 Mo. 424, the defendant holds the purse strings of the Hospital Association. Not a dollar does it get save through defendant. Defendant pays for itself $500, and the remainder is paid by the tribute which defendant levies upon its employees, which is collected and paid through defendant. The hospital system is a worthy one and a well-taken advance step, but under the record in this case such Hospital Association is but the agent of the defendant.

II. We come now to the competency of the following letter:

"St. Louis and San Francisco Railroad Company.
"*G. W. Cale, Jr.,* Chief Surgeon.
"Springfield, Mo., Apr. 13, 1904.
"Mr. W. P. Newton,
Assistant General Auditor,
St. Louis, Mo.
"Dear Sir: Mr. J. B. Phillips, who was in the hospital, is mentally unbalanced and should be sent to an asylum for treatment. Won't you please advise his family or friends so that necessary steps can be taken to protect him? Yours truly,
"G. W. Cale, Jr."
Stamped on back:
"Vice Pres't & Gen'l Auditor, Apr. 14, 1904.
"St. L. & S. F. R. R. Co."

The writer of this letter was the chief surgeon of the Hospital Association, and by rule thirteen hereinabove discussed was the chief surgeon of the defendant. He was therefore the agent of defendant having in charge the treatment of the deceased. Under rule thirteen, supra, defendant seems to have had a chief surgeon, division surgeons and local surgeons, and Dr. Cale was the head of this line of medical agents under the appointment of defendant by force of this rule. The letter was written to the assistant of the head of another department. It conveyed the facts which Dr. Cale had learned in the course of his official duties as the chief surgeon of defendant, under rule thirteen, supra.

It was at least partly for the information of a coordinate department of the defendant railway company's service. This letter was written two days after the death of plaintiff's husband, but at a time when neither the plaintiff, the defendant nor the writer knew of such fact. The letter was excluded by the learned

trial judge.   Was his action in this respect correct?
We think not.   Rule four of the Hospital Association
reads:

"The association will not furnish treatment for
contagious, chronic, incurable, or venereal diseases,
nor cases of insanity, nor injuries or diseases the re-
sult of intemperance, vicious habits, personal difficul-
ties."

By rule three of the defendant hereinabove fully
set out, the deceased, being at work in the auditor's
department of defendant, could not even gain admis-
sion to the hospital without a certificate from the head
of that department, nor could he get transportation
to which he was entitled, save through that department.
Under these rules, when taken and considered together,
it became and was the duty of the chief surgeon, or
what we might term the head of the medical depart-
ment of defendant, to inform the head of the depart-
ment issuing the certificate to deceased, under rule
three of the defendant, that such party was insane,
and that under rule four, quoted last above, he was not
such a person as to whom medical attention was due.

This letter therefore is but one written by the
chief surgeon of defendant in the line of his duty, as
such duty appears from the uncontradicted record evi-
dence.   It in effect notified the auditor's department
that the man was insane, and should be sent to a
proper asylum.   That he was not entitled to further
treatment in the hospital under the rules thereof, and
that no further certificates should be given him.   If
Dr. Cale was the agent of the defendant, as we have
seen that he is, then such an admission made pertain-
ing to things occurring and being done by him in
the course of the performance of his duty, is an ad-
mission of the defendant.   The letter-head upon which
the letter was written shows him to be defendant's
chief surgeon, as well as the chief surgeon of the

hospital. This was the third time that the deceased had been under the treatment of the hospital force, and if he was insane, it was the duty of defendant's chief surgeon, who was also chief surgeon of the hospital, to make known that fact under the rules above mentioned. His duties had not yet terminated, and when he wrote the letter he was simply in the performance of such duties. Under such circumstances this letter is in the nature of a report made by one official to another, and is not in the same line as a statement made, after an accident, but too late to be recognized as a part of the *res gestae*. The cases usually applying the *res gestae* doctrine have no application here.

We think that this letter is in the nature of an official report from one of the chief officials of defendant to another of such officials and a report which was contemplated by the rule. It stands in the nature of an admission by an agent, whilst acting in the line of duty, and as such is an admission of defendant. [Malecek v. Railroad, 57 Mo. l. c. 21; McGenness v. Adriatic Mills, 116 Mass. l. c. 180; 2 Wharton's Law of Evidence (3 Ed.), sec. 1177.]

In the Missouri case cited, it was said: "The evidence of the admissions of Buell, the company's superintendent, was certainly admissible to prove that it recognized the assault, etc., of its driver, and justified it upon the ground of the non-payment of fare. Corporations can only act and speak through their authorized agents. The acts and admissions of Buell, in this regard, were those of the corporation."

The Massachusetts court in the case cited, speaks tersely in this language: "The remaining question is in reference to the admission in evidence of the statement of the superintendent. The defendant is a corporation, and can only act through agents, and, in the absence of any evidence to the contrary, the superin-

tendent in charge of the mill must be deemed the proper person to whom to make complaint and to have authority to give information and direction in regard to the drainage from it. His recognition that it was a matter that required to be attended to and should be, was therefore properly put in evidence. [Morse v. Railroad, 6 Gray 450.] The expression used by him, that he 'would not have it around his place as it was around there for $500,' was a mere mode of stating that the nuisance existed, and could not have been considered as an admission that this sum was the amount of the damages, nor do we understand that it was put in evidence as such."

And Dr. Wharton, in his most excellent work, couches the rule thus: "As has been already incidentally seen, a party who commits the management of his whole business, or of a particular line of his business, to an agent, is bound by the admissions of the agent, as to his entire business committed to him; nor, when the agent is a general agent, representing his principal continuously, is it necessary for the admission of such declarations that they should either have been part of the *res gestae,* or should have been specially authorized. Eminently is this the case with corporations." [2 Whart. Law of Ev. (3 Ed.), sec. 1177.]

Other cases are cited in the briefs and others not cited could have been cited, but these suffice to illustrate the rule.

Said letter is at least admissible to show that Dr. Cale, defendant's chief surgeon and agent, had knowledge of the fact that deceased was unbalanced in mind, when he permitted him to be placed upon the train unattended. [McDermott v. Railroad, 87 Mo. 285.] To what was said by HENRY, C. J., in that case, we can add nothing, for the proposition is fully discussed

-and the cases reviewed. There was error in refusing to admit this letter.

III. It is next contended that defendant is liable only for such injuries as could have been reasonably expected to have been foreseen. That is to say, if it be granted that defendant was negligent, yet it is only liable for such injuries as would reasonably be expected to follow from such negligence and not for mere remote contingencies. In this we think the defendant is correct. But apply the rule to this case. In the view we have just expressed the defendant, by and through its agent, had assumed the duty of treating the deceased. The evidence tended to show that the patient was insane, and that defendant had knowledge of that fact. Now, if the patient was insane and the defendant had knowledge of that fact, then might it not have reasonably presumed that accident might befall a man in that condition? The freaks of a wandering mind are varied, it is true, but none knew them better than the skilled chief surgeon, who represented the defendant, when he had the deceased conveyed to the train. We are not saying that the act of placing his practically undressed body across a street railway track was the result of his insane condition, but there are sufficient circumstances to authorize the submission of the question, under properly guarded instructions, to a jury for its decision. It cannot be said that such an act was not one that could not have been reasonably anticipated by defendant's surgeon when he placed an insane man aboard of a train, unattended and without notice to his family, knowing that he would have to find his home in a populous city, filled with a network of street railway lines. The rule is properly stated by Thompson in his work on the Law of Negligence, sec. 59, thus: " 'It is not necessary,' said the Supreme Court of Minnesota, following the

Supreme Judicial Court of Massachusetts, 'that the injury in the precise form in which it in fact resulted should have been foreseen. It is enough that it now appears to have been a natural and probable consequence.' In other words, it is not necessary to a defendant's liability, after his negligence has been established, to show, in addition thereto, that the consequences of his negligence could have been foreseen by him; it is sufficient that the injuries are the natural, though not the necessary and inevitable, result of the negligent fault—such injuries as are likely, in ordinary circumstances, to ensue from the act or omission in question." This rule has found full recognition in this State. [Miller v. Railroad, 90 Mo. l. c. 394.]

A case very much in point is the case of Railroad v. Parry, 67 Kan. 515. In the Parry case, the passenger became mentally unbalanced whilst on the train and was by the conductor placed in charge of the depot-master after being taken from the train. The depot-master permitted him to leave the depot and his custody while in that condition. He wandered some five miles and placing himself across the track was killed. The case before us is much stronger. Here the deceased occupied a double relationship to the defendant. He was not only a passenger but he was likewise a patient being treated by defendant's agent. Defendant's agent had full knowledge, if the evidence be true, that deceased was insane. Defendant through its agent had that knowledge when deceased was placed on the train, and this exclusive of the evidence tending to show the condition and actions of deceased whilst on the train.

Of course, if the deceased was not insane, it matters not what means he used to end his life. If he was not insane there can be no liability upon the part of defendant. Defendant's liability must be bottomed on the facts that deceased was insane; that defendant

knew such fact; and that his death was occasioned by reason of such fact.

It must be found that the act of lying down upon the railroad track was the result of his mental condition aforesaid. In his unfortunate death there are some circumstances tending to show that a perverted mind might have been attempting to place a tired body to rest for the night. For instance, the taking off of the outer garments.

Under proper instructions this cause should have been submitted to the jury and the trial court erred in giving the peremptory instruction for the defendant. The cause is reversed and remanded to be proceeded with in accordance with these views.

All concur.