VIRGINIA RUTH HERRICK, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 25670.)

Court of Claims, January 23, 1942.

*Melvin & Melvin* [*Lawson Barnes* of counsel], for the claimant.

*John J. Bennett, Jr., Attorney-General* [*Joseph I. Butler, Assistant Attorney-General*, of counsel], for the defendant.

GREENBERG, J. Claimant, twenty-one years of age, a student nurse at the Syracuse Memorial Hospital, was sent to the Utica State Hospital on March 3, 1939, as an affiliate nurse for a three months' course in psychiatry and psychiatric nursing. Prior thereto, and while in her second year of training at the Syracuse Memorial Hospital, she suffered from a detached retina of her left eye, as a result of which she was bedridden for approximately three months and incapacitated until January 1, 1939, when she returned to the Syracuse Memorial Hospital to resume her course in training. This was done upon the advice of Dr. David F. Gillette, chief of the eye department of the Syracuse Memorial Hospital, with the admonition that she could live " a normal life " but that she could not do any lifting or engage in active sports. The nature of her illness was such that the retina of her left eye might again easily become detached, by any sudden movement, force or any unexpected muscular strain. In line with the advice of her physician, and in accordance with the requirements of the Utica State Hospital, a report of claimant's physical condition was filed by the Syracuse Memorial Hospital upon her admission to the Utica State Hospital. Said report contained the statement that claimant " had trouble with her eyes " and requested that she be not allowed to do any heavy lifting. It did not inform the Utica State Hospital of the exact nature of her eye trouble and that her left eye was predisposed to a detachment of the retina.

On April 10, 1939, at or about seven-fifteen A. M., while claimant was in ward 24 of the State hospital, she, together with a regular nurse and an attendant, took some sixty female patients to the cafeteria for breakfast. There were at the time about fifty other women patients from ward 20 in the cafeteria in charge of two attendants from that ward. In addition thereto, there were in the cafeteria four dining room attendants. While the claimant was at one end of the cafeteria collecting the trays and knives and spoons from the inmates as they passed her on their way out of the cafeteria, it is claimed that one of the patients, Sophie Miakisz, suddenly struck the claimant on the head with her fist, bending her eyeglasses and causing the alleged injuries to her left eye, the same eye in which she had suffered from the detached retina above referred to.

The inmate assailant was suffering from dementia praecox of the catatonic type and her hospital record was as follows: " Patient tears clothing and is very untidy in appearance. She

is over-active, dances about the ward and annoys the other patients. Disoriented. Usually sleeps well but is disturbed at times. * * * " She was not a violent, dangerous type of patient, necessitating isolation or special or extraordinary attention.

After the alleged assault, claimant continued to do her work in the cafeteria and claims to have reported the accident later in the day to Mrs. Wamphler, the nurse in charge of ward 24. However, the proof is that Mrs. Wamphler was not in attendance that day and there is no record or report of such an incident. Claimant also contends that on the day following she reported the assault to Miss Clough, the assistant principal of the school of nursing, who did not recall the same and had no record of it. Claimant continued doing the work assigned to her at the hospital until May fourteenth, when she went to Syracuse to see Dr. Gillette, who had previously treated her eye. She did not inform him that she was struck on the head on April tenth. The doctor found, upon examination, a slight edema but did not consider it serious enough to keep claimant from continuing her studies and work at the Utica State Hospital. Thereupon she returned to the Utica State Hospital and continued her studies and course of work and instructions until after classes were over on May 22, 1939, when she informed Miss Loretta Clough that she could not see out of her eye, whereupon Miss Clough caused an examination to be made by Dr. Werner Hamburger, a member of the medical staff of the Utica State Hospital, and her condition was diagnosed as a detachment of the retina and she was ordered to bed. Dr. Francis T. Chase, an eye specialist, was then called, and in getting the claimant's history had no information about a blow or attack on claimant's eye. After remaining in bed for three days she was taken by ambulance to the Syracuse Memorial Hospital where she remained, receiving medical care and attention until November 23, 1939.

The claim herein is based upon the failure of the Utica State Hospital and the authorities in charge thereof to maintain adequate supervision of the inmates, including the inmate Sophie Miakisz, while they were in the cafeteria, as a result of which claimant was assaulted. The assailant was not violent nor did the hospital authorities have any notice of any predisposition on her part to commit violence. On the contrary, the record herein is devoid of any proof that she was the type of inmate that should have been isolated and kept apart from other inmates or specially guarded by nurses or attendants or that her association with other patients of her ward and her attendance in the cafeteria for breakfast was not in accordance with the ordinary, customary and usual practice of caring for such inmates. The State, therefore, cannot be charged

with negligence because Sophie Miakisz was allowed to be in the cafeteria with the other women of her ward. There was nothing unusual about her mental condition to justify any reasonable perception of any risk in allowing her to be with the other inmates in the cafeteria nor was any risk on that account within the range of reasonable apprehension.

Can the State be charged with negligence because of its failure to have additional nurses and attendants in charge of the patients while in the cafeteria? Would additional nurses or attendants have prevented such an accident? There were, at the time of the alleged assault, in addition to the claimant, four regular nurses or attendants and four dining room attendants. Even if there were more attendants or nurses in charge of the patients in the cafeteria, the assault might not have been prevented. The alleged striking was sudden and momentary and the hospital authorities had no notice of its imminence. How, then, could such a happening have been avoided? Even a guard or attendant for each and every inmate would not have avoided what is alleged to have happened to the claimant. There is no such duty on the part of the State to maintain such supervision. Any such rule of law would place an unreasonable burden upon the State or upon the authorities of the State in charge of insane patients. They would, under such circumstances, be obliged to have a guard or attendant for each and every inmate and might even be compelled to handcuff or otherwise control the activities and each and every motion of such patients so as to prevent any possible injury or harm to any nurses or attendants in such institutions. They might even have been obliged to isolate and seclude each and every patient in the hospital.

Furthermore, there is no causal connection between the alleged neglect of the State authorities to have more adequate supervision and the happening of the alleged assault on the claimant. Such neglect, if it really existed, was not the proximate cause thereof. " The damages must be so connected with the negligence that the latter may be said to be the proximate cause of the former." (*Palsgraf* v. *Long Island R. R. Co.*, 248 N. Y. 339, 351.) The proof herein does not establish the existence of any reasonably dangerous condition in the cafeteria nor a causal connection between the happening of the accident and any breach of duty by the State. " Legal or proximate cause is always dependent upon the facts of a particular case, and it is for this reason that the words are beyond definition or conclusive explanation. Very often it is confused with the preliminary question whether there is any negligence at all. The difficulty of applying general rules drawn from previous incidents to a new set of circumstances is illustrated in

*Palsgraf* v. *Long Island R. R. Co.* (248 N. Y. 339). The general underlying principle of that case is that the negligence does not exist unless there is a reasonable likelihood of danger as a consequence of the act complained of. It found expression in the prevailing opinion in these words: ' The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.' The possibility of an accident must be clear to the ordinarily prudent eye. This court further said in that case: ' The range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury.' " (*O'Neill* v. *City of Port Jervis*, 253 N. Y. 423.)

The authorities cited in support of the claim herein, to wit: *Martindale* v. *State of New York* (269 N. Y. 554); *Shattuck* v. *State of New York* (166 Misc. 271); *Wilcove* v. *State of New York* (146 id. 87); *Luke* v. *State of New York* (253 App. Div. 783); *Curley* v. *State of New York* (148 Misc. 336) are not in point or applicable to the facts in the instant case. While those decisions were based on the negligence of the State in the matter of supervision, as a result of which the inmates involved in each of said cases sustained injuries or met with death, it must be borne in mind that the injured were inmates of a State institution for the care and treatment of mental defectives. In such cases the State assumed the responsibility of caring for and keeping such individuals from harm and injury. " Public or private institutions maintained for the care of those unfortunates suffering from mental or nervous defects or diseases have imposed upon them the legal duty of taking every reasonable precaution to protect their patients from injury, either self inflicted or otherwise. (*Van Patter* v. *Towns Hospital*, 246 N. Y. 646; *Paige* v. *State*, 245 App. Div. 126; *Curley* v. *State*, 148 Misc. 336; *Wilcove* v. *State*, 146 id. 87; *Phillips* v. *St. Louis & S. F. R. R. Co.*, 211 Mo. 419; 111 S. W. 109; *Martindale* v. *State*, 269 N. Y. 554.) " (*Shattuck* v. *State of New York*, supra, 273.)

The obligation and duty of the State to the claimant herein, under the circumstances heretofore set forth, is quite different from the responsibility of the State to inmates. The degree of care and caution with respect to inmates is far greater and more exacting because they are the wards of the State and the State is a guardian of their person and well-being. There is no such obligation or duty to the claimant herein.

Claimant, in accepting the assignment at the Utica State Hospital, knew she would be placed in contact with mentally deranged and incapacitated patients of said institution. If there was any danger on that account she voluntarily took it. Having taken the course

of instructions at the State hospital in preparation for her career as a nurse, she, with full knowledge of the possible risk of injury which might result from such association, assumed at her own risk any consequence thereof. The risk above referred to was a risk incident to the association and contact with mental patients and was assumed by the claimant herein.

The only proof of the assault to the claimant was the testimony of the claimant. No other witnesses testified for or on behalf of the claimant in any way substantiating or corroborating the fact that she was assaulted by the inmate Sophie Miakisz. There was no outcry by the claimant at the time of the assault. She continued working in the cafeteria and in the ward before making any complaint to the authorities. Her testimony with respect to her reporting the accident is disputed by the hospital records, and, therefore, is questionable. Her failure to advise Dr. Gillette on May fourteenth when she went to him for examination at the Syracuse Memorial Hospital, that she was hit on the head or eye by a patient, is unexplained. However, giving the claimant the benefit of the doubt, and granting that the claimant was assaulted as testified to by her, the proof herein does not establish the existence of any reasonably dangerous condition in the matter of supervision of the inmates of the State hospital nor a causal connection between the happening of the accident and a breach of duty by the State.

The claimant has failed to meet the burden of proof imposed upon her by a fair preponderance of the evidence, and under the circumstances the claim herein should be dismissed.

DYE, J., concurs.