ARLINGTON HOTEL COMPANY *v.* TANNER.

Opinion delivered February 9, 1914.

1. MASTER AND SERVANT—DUTY TO PROVIDE SAFE PLACE TO WORK.—It is the duty of the master to exercise ordinary care to provide a safe place for his servants to work, and also to provide the servants with safe appliances. (Page 343.)

2. MASTER AND SERVANT—INJURY TO SERVANT BY ACT OF INSANE EMPLOYEE.—Plaintiff was employed by defendant and was shot by another servant who it appeared was insane. In an action for damages against defendant, *held,* the burden is upon plaintiff to show that defendant retained the insane employee in its service

after having cause to believe, either from his general reputation or his conduct on particular occasions, known to it or its officers, that he was partially insane and on that account likely to become dangerous to the other employees of the defendant with whom he was thrown in contact in the discharge of his duties. (Page 344.)

3.  EVIDENCE—RES GESTAE—STATEMENTS OF EMPLOYER.—In an action for damages against a hotel company by reason of injuries sustained by plaintiff by being shot by another employee, evidence of statements of the hotel manager, five weeks after the accident, held inadmissible. (Page 344.)

4.  MASTER AND SERVANT—LIABILITY OF MASTER FOR ACTS OF INSANE SERVANT.—The mere knowledge by a master that an employee is partially insane, is not sufficient to render the master liable for damages for an injury inflicted upon another employee by the insane servant, unless there was something to show that the master knew the employee was dangerous, or likely to become so. (Page 345.)

Appeal from Garland Circuit Court; *Calvin T. Cotham,* Judge; reversed and dismissed.

STATEMENT BY THE COURT.

George Tanner brought this suit against the Arlington Hotel Company, a domestic corporation, to recover damages for injuries received by him while in its employment, and which were alleged to have been sustained by reason of the negligence of the defendant. The facts shown by the plaintiff, briefly stated, are as follows:

The plaintiff was a cook employed by the hotel company, and while engaged in his work at the stove in the kitchen on the second floor of the hotel, Henry Bailey, another servant of the hotel company, suddenly appeared in the kitchen with a loaded rifle and fired it at the servants engaged at work at the stove. The bullet from the gun struck the plaintiff in the hand and severely injured him. It also struck Joe Shroeder, another cook, and he fell by the range dead. Henry Bailey was a negro and had been employed by the hotel company for about fourteen years. He worked down stairs in the yard, and also attended to the closet used by the waiters of the hotel. He was accustomed to go through the kitchen almost daily

to get supplies which he used in his work. By permission of the hotel company, he was also permitted to press the coats worn by the waiters, but the waiters paid him for this service. Up to within a few months before he shot the plaintiff he had always been known as a quiet, peaceable and industrious negro, and was very religious. Then his habits changed, and he became fractious and fretful for no real reason, and when money was paid him by the waiters for pressing their clothes, he frequently said they were trying to pass counterfeit money on him, when, in fact, the money was not counterfeit. Sometimes he said the money given him was too hot to handle, and threw it down. He would frequently mutter to himself while at work, and on several occasions was seen to throw the broom or mop he was working with on the floor and walk off and leave it. Sometimes he would walk off, muttering and scratching his head. He was also seen standing in front of a church which he frequented, making gestures and hitting his hands on a post. One of the witnesses for the plaintiff stated that about two months before the shooting occurred, Bailey became very angry at him, but that he made no attempt to assault him; that he had an argument with Bailey about his coat, and that Bailey first claimed that it was not his coat, and that the money he had paid him was counterfeit; that he noticed Bailey looked curious and would talk and sing to himself a great deal, and that his reputation was that he had become insane. On cross examination he stated that he never knew of Bailey assaulting or trying to kill any one; that he was looked upon as a harmless and inoffensive man. Another servant stated that several days before the shooting he told the manager of the hotel, who had charge of Bailey and the kitchen servants, that he thought Bailey was crazy.

The facts detailed above were stated to two physicians in a hypothetical question, and in answer to it they both stated that they would not consider Bailey of sound mind; that they meant by that that he was partially insane, and further stated that from the symptoms detailed

in the hypothetical question, they thought there was a chance for him to become violent. On cross examination they stated, in effect, that the only reason they thought that he was likely to become violent was the fact that they considered from the symptoms detailed in the hypothetical question that he had become partially insane.

Numerous servants of the hotel were introduced by the defendant, and they all testified that Bailey was considered a quiet, inoffensive and harmless person, and that his mental unsoundness had never been considered as likely to cause him to become dangerous to the other servants of the hotel. Other facts will be stated and referred to in the opinion. The jury returned a verdict for the plaintiff, and the case is here on appeal.

*Cockrill & Armistead,* for appellant; *Martin & Wooten* and *R. R. Lynn,* of counsel.

The master is not liable for the acts of its servants committed without the scope of his employment. 77 Ark. 606; 93 Ark. 397; 2 Cooley on Torts, § 1032; 26 Cyc. 1536; Wood on Master and Servant, § 562; 107 App. Div. (N. Y.) 120; 211 Pa. St. 107; 65 Fed. 969; 18 Wash. 163; 165 Mass. 348; 126 Mich. 559; 162 Mass. 319; 127 Mich. 496; 60 Mo. 413; 59 Ark. 395; 81 Ark. 368; 89 Ark. 92; 101 Ark. 586; Labatt's Master and Servant (new ed.), vol. 6, ¶ 2273, *et seq.*

The test of the master's liability is not whether the act was done during the existence of the servant's employment, but whether it was committed in the prosecution of the master's business.

The testimony was not sufficient to submit to the jury the question that the appellant was negligent in retaining in its employ an insane and dangerous servant. There can be no presumption that an insane person is dangerous. 64 Pac. 769.

The testimony of witness Tanner was incompetent. It was too remote to be a part of the *res gestae.* 66 Ark. 494.

The opinions of nonexpert witnesses are incompetent. 103 Ark. 196.

*A. J. Murphy,* for appellee.

1. The appellant was liable because, (1) It was negligent in employing or keeping in its employ a crazy negro, when it knew, or ought to have known, that he was unsafe to have associated with other servants, and that he might on account of his insanity, reasonably be expected to do some injury to his fellow-servants, by some act outside the scope of his employment as well as within it; (2) because the injury occurred as the natural and probable consequence of appellant's act of negligence. 136 S. W. 435; Labatt on Master and Servant, vol. 3, § § 898, 902, 917, 1079; 72 N. W. 1124; 65 Am. St. 137; 77 Ark. 606; 93 *Id.* 397; 89 *Id.* 92; 101 *Id.* 586.

2. The master is liable for those injuries to his servant which could have been obviated by exercise of reasonable care. 3 Labatt on Master and Servant, § 894; 48 L. R. A. 368, note; 120 N. W. 302; 87 Am. Dec. 635; 65 *Id.* 222; 86 Am. St. 453.

3. The evidence was sufficient and competent to go to the jury on the question that Bailey was dangerous. 4 Labatt on Master and Servant, p. 4838, § 1596, and note.

4. There is no error in the instructions. The word "competent," as used in the instructions for appellee, was proper. Universal Dictionary; Ann. Cases 1912, c. 92-96, and note; Labatt, Master and Servant, vol. 3, § 1083, c. 2869. See 104 Ark. 205; 103 *Id.* 397; 101 *Id.* 433.

5. Nonexpert witnesses' opinion admissible. *Schuman* v. *State,* 106 Ark. 362.

HART, J., (after stating the facts). It is first contended by counsel for defendant that under the undisputed evidence, Bailey, at the time of the shooting, was not engaged in any act within the scope of his employment, and that, therefore, the hotel company was not liable. In support of their position they cite the following cases, and others of like character: *St. Louis, I. M. & S. Ry. Co.* v. *Grant,* 75 Ark. 579; *Peter Henderson & Co.*

v. *Diaz,* 77 Ark. 606; *Sweden* v. *Atkinson Improvement Co.,* 93 Ark. 397. In none of the cases, however, was it alleged or proved that the servant for whose negligence the master was sought to be held liable had become mentally incompetent, and the question of the negligence of the master in retaining a mentally incompetent servant was not made an issue.

In Labatt on Master and Servant (2 ed.), vol. 3, § 1079, the author states: "The rule established by the cases to be reviewed in this chapter may be stated in formal terms as follows: The hiring or retention of a servant whose unfitness for his duties, whether it arises from his want of skill, his physical and mental qualities, or his bad habits, is known, actually or constructively, to the master, is culpable negligence, for which the master must respond in damages to any other servants who may suffer injury through that unfitness."

In the case of *Dibari* v. *J. W. Bishop & Co.,* 199 Mass. 254, 17 L. R. A. (N. S.) 773, the court said: "In a sense, workmen are appliances. If a master knowingly employs servants who are incompetent by reason of their habits, or otherwise, he is liable for an injury occasioned to a fellow-servant by their incompetency just as he would be liable for an injury caused by a defective machine."

In the case of *Missouri, Kansas & Texas Ry. Co.* v. *Day,* decided by the Supreme Court of Texas, and reported in 136 S. W. 435, the facts were that a "straw boss" for the railway company wilfully assaulted a laborer working under him. The evidence tended to show that the "straw boss" was drinking heavily at the time he assaulted his co-laborer; that he was addicted to the habit of drinking, and while under the influence of drink was a quarrelsome and dangerous man; that such was his general reputation, and that his reputation in this respect was notorious. The court held that there could be no difference whether the injury resulted from negligence in doing the master's work or from an assault made by a dangerous, drunken and desperate employee, if his reputation in that respect was such that the master

might have foreseen such consequences. The court further held the evidence introduced made it a question for the jury to say whether the railway company was negligent in employing and retaining the straw boss in its employment, and, if so, whether the negligence was such as rendered the railroad company liable.

In the case of *Christian* v. *Columbus & Rome Ry. Co.,* 79 Ga. 461, the declaration alleged that the husband of the plaintiff went into the office of an agent of the railway company for the transaction of business pertaining to the agency, and was killed by the agent. The declaration further alleged that the agent was subject to a disease of the mind, and that his disease became at intervals homicidal mania, and that this fact was known to the railroad company. A demurrer was sustained to the complaint, and the Supreme Court held that inasmuch as the declaration alleged that the railroad company employed him, knowing of his infirmity, the railroad company was liable for the consequences of its agent's act in killing the plaintiff's husband.

In general it may be said that it is the duty of the master to exercise ordinary care to provide a safe place for his servants to work, and also to provide them with safe appliances. In the case at bar, the plaintiff was injured while in the discharge of his duties as a servant of the hotel company. In the application of the principles of law above announced, we think the question of whether the hotel company could in any event be held liable for the tortious acts of Bailey under the facts adduced in evidence in this case was one of fact for the jury. It is true that the plaintiff and Bailey did not work in the same department, and that their work had no necessary relation; but it was shown by the plaintiff that Bailey had occasion to go through the hotel kitchen almost daily to procure supplies for his own work, and that he was accustomed to do so. This necessarily brought him in contact with the plaintiff to a certain extent, because the plaintiff was at all times at work in the kitchen. If it was further shown by the plaintiff that Bailey had be-

come dangerous by reason of insanity, or was likely to become so, and that the hotel company knew this fact, or, by the exercise of ordinary care, might have known it, a jury would be warranted in finding that the hotel company might have reasonably foreseen that Bailey was likely to injure any of its employees with whom the duties of his own work brought him in contact, and it would have been the duty of the hotel company to have discharged Bailey, and upon its failure to do so it would become liable for his tortious acts.

This brings us to a consideration of the question of whether there was any testimony of a substantial character tending to show that Bailey had become dangerous, or was likely to become so, and, if such was the fact, whether or not the officers of the hotel company had knowledge of that fact or, in the exercise of ordinary care, should have known it. Many witnesses were introduced who testified that for several months prior to the shooting, Bailey's mental faculties had become impaired, and that he was accustomed to mutter and talk to himself. They further stated that he had delusions in certain respects, but all of them testified that he was considered inoffensive and harmless. It is true one of them testified that about two months before the shooting Bailey became very angry in an argument with him about his coat, but this witness stated that Bailey made no attempt to harm him and that he never knew of him assaulting, or trying to kill, anybody. He further stated that Bailey was regarded as a harmless and inoffensive man. Moreover, it is not shown that the officers of the hotel company had any knowledge of this fact. The plaintiff himself testified that the manager of the hotel company, about five weeks after he had received the injury, told him that he was sorry he had been injured, and said that he should have gotten rid of Bailey because he knew he was crazy. This testimony was too remote to be a part of the *res gestae,* and was incompetent and should not have been admitted over the objections of the defendant. *Little Rock Traction & Elec. Co.* v. *Nelson,* 66 Ark. 494. It is.

true physicians, in answer to a hypothetical question asked them, in which was described the mental peculiarities and actions of appellee, as set out in our statement of facts, gave it as their opinion that he was partly insane and was likely to become violent. Their testimony further shows, however, that their reason for stating that he might become violent was because all insane people may become violent. The burden was upon plaintiff to show that the hotel company had retained Bailey in its service after having cause to believe, either from his general reputation or his conduct on particular occasions, known to it or its officers, that he was partially insane, and on that account likely to become dangerous to the other employees of the hotel company with whom he was thrown in contact in the discharge of his duties. *St. Louis, I. M. & S. Ry. Co.* v. *Mogart's Admx.,* 45 Ark. 318.

We are of the opinion that when the whole evidence is considered in all its bearings, there was no testimony tending to show that the officers of the hotel company knew that Bailey was dangerous, or likely to become so, unless such deduction might be drawn from the fact that he had become, to some extent, mentally unbalanced; and we do not think that the jury might have inferred that the hotel company knew that Bailey was dangerous or likely to become so from the fact, merely, that he was shown to be partially insane. See *Atkinson* v. *Clark,* 64 Pac. (Cal.) 769. It follows that the judgment must be reversed, and, because the facts seem to have been fully developed on this trial, the cause of action will be dismissed.